HARDIMAN, Circuit Judge,
dissenting.
The Second Amendment states: “A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.” In District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), the Supreme Court held that the Second Amendment protects an individual right to keep and bear arms for purposes of self-defense. Two years later, the Court applied the Second Amendment to the States in McDonald v. City of Chicago, — U.S.-, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010). Because I am convinced that New Jersey’s law conditioning the issuance of a permit to carry a handgun in public on a showing of “justifiable need” contravenes the Second Amendment, I respectfully dissent.
I
As befits a diverse nation of fifty sovereign States and countless municipalities, gun regulation in the United States resembles a patchwork quilt that largely reflects local custom. Regarding the public carry of firearms, two dichotomies are relevant to this case. First, in many States, laws distinguish between open carry of a handgun — such as in a visibly exposed belt holster — and concealed carry — such as hidden from view under clothing or in a pocket. Thirty-one States currently allow open carry of a handgun without a permit, twelve States (including New Jersey) allow open carry with a permit,[1] and seven *441 States prohibit open carry entirely.[2] By contrast, four States and parts of Montana allow concealed carry without a permit[3] and forty-four States allow concealed carry with a permit.[4] One State, Illinois, prohibited public carry of handguns altogether, but that law was struck down as violative of the Second Amendment by the United States Court of Appeals for the Seventh Circuit in December 2012. See Moore v. Madigan, 702 F.3d 933 (7th Cir.2012).
The second relevant dichotomy is between “shall-issue” and “may-issue” permitting regimes. In the forty shall-issue States,[5] permitting officials must grant an application for handgun carry permits so *442 long as the applicant satisfies certain objective criteria, such as a background check and completion of a safety course. See Nicholas J. Johnson et al., Firearms Law and the Second Amendment 21 (2012)... In these jurisdictions, a general desire for self-defense is sufficient to obtain a handgun.
Eight States, including New Jersey, have may-issue permitting regimes.[6] See id. In these States, local authorities have more discretion to decide who may be granted permission to carry a handgun, and the general desire to defend one’s self or property is insufficient for the permit to issue. Instead, an applicant must demonstrate “justifiable need,”[7] “proper cause,”[8] or “good and substantial reason”[9] to carry a handgun. Although these standards are phrased differently, they are essentially the same — the applicant must show a special need for self-defense distinguishable from that of the population at large, often through a specific and particularized threat of harm. See Maj. Typescript at 428-29 & n. 2 (discussing New Jersey law); Woollard v. Gallagher, 712 F.3d 865, 869-70 (4th Cir.2013) (discussing Maryland law); Kachalsky v. Cnty. of Westchester, 701 F.3d 81, 86-87 (2d Cir.2012) (discussing New York law).[10]
The relative merits of shall-issue regimes versus may-issue regimes are debatable and it is not the role of the federal courts to determine the wisdom of either. And but for the doctrine of incorporation, the States would be free to choose whatever policy they desired without federal intervention. Since McDonald, however, we find ourselves in a situation akin to that in which the federal courts found themselves after the Supreme Court held that the exclusionary rule applied to the States in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). Prior to that decision, many States did not require the exclusion of illegally obtained evidence in recognition of the “grave adverse consequence that exclusion of relevant incriminating evidence always entails (viz., the risk of releasing dangerous criminals into society).” Hudson v. Michigan, 547 U.S. 586, 595, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006); see also Elkins v. United States, 364 U.S. 206, 224-25, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) (in the year before Mapp, twenty-two States had a full exclusionary rule, four States had a partial exclusionary rule, and twenty-four States had no exclusionary rule).
As it did with the exclusionary rule, the Supreme Court has applied the Second Amendment to the States, McDonald, 130 S.Ct. at 3026, and “the enshrinement of constitutional rights necessarily takes certain policy choices off the table,” Heller, 554 U.S. at 636, 128 S.Ct. 2783. So the question presented is not whether New Jersey’s justifiable need requirement is a reasonable, let alone a wise, policy choice. Rather, we must decide whether the New Jersey statute violates the Second Amendment.
II
With few exceptions, New Jersey law prohibits handgun possession in public *443 without a permit. See N.J. Stat. Ann. § 2C:39-5(b). In addition to meeting certain age, criminal history, and mental health requirements, an individual seeking a permit must complete a training course, pass a test of the State’s laws governing the use of force, provide qualification scores from test firings administered by a certified instructor, and demonstrate a “justifiable need” to carry a handgun. See id. § 2C:58-4(c); N.J. Admin. Code § 13:54-2.4. “Justifiable need” is defined as:
the urgent necessity for self-protection, as evidenced by specific threats or previous attacks which demonstrate a special danger to the applicant’s life that cannot be avoided by means other than by issuance of a permit to carry a handgun.
N.J. Admin. Code § 13:54-2.4(d)(l). “Generalized fears for personal safety are inadequate, and a need to protect property alone does not suffice.” In re Preis, 118 N.J. 564, 573 A.2d 148,152 (1990).
An application for a handgun carry permit is first made to a police official, who determines whether the applicant meets the statutory requirements. N.J. Stat. Ann. § 2C:58^4(c). Upon approval, the police present the application to a Superior Court judge for independent review of whether the statutory requirements, including “justifiable need,” have been met. Id. § 2C:58-4(d). The Superior Court judge may issue an unrestricted permit, issue a limited-type permit that restricts the types of handguns the applicant may carry and where or for what purposes such handguns may be carried, or deny the application. Id. If the Superior Court denies an application, the applicant may appeal the decision, id. § 2C:58^(e), but appellate review is highly deferential, see In re Pantano, 429 N.J.Super. 478, 60 A.3d 507, 510 (App.Div.2013).
Appellants brought suit under 42 U.S.C. § 1983 to challenge New Jersey’s justifiable need requirement, arguing that it is incompatible with the Second Amendment. Each of the individual appellants — a group which included a reserve sheriffs deputy, a civilian FBI employee, an owner of a business that restocks ATM machines and carries large amounts of cash, and a victim of an interstate kidnapping — applied for a handgun carry permit, but were denied for want of justifiable need.[11]
The District Court rejected their challenge in a series of alternative holdings. Piszczatoski v. Filko, 840 F.Supp.2d 813 (D.N.J.2012). First, it ruled that the Second Amendment does not protect a general right to carry a gun for self-defense outside the home. See id. at 820-29. Second, the Court concluded that even if the law “implicate[d] some narrow right to carry a firearm outside the home,” the law is a “longstanding” regulation that is presumptively constitutional. See id. at 829-31. Finally, it determined that even if the Second Amendment extended outside the home and the law was not longstanding enough to be presumptively constitutional, it would still survive intermediate scrutiny. See id. at 831-37.
Ill
Pursuant to the first prong of the test we established in United States v. Marzzarella, 614 F.3d 85, 89 (3d Cir.2010), we must determine whether New Jersey’s justifiable need requirement burdens conduct protected by the Second Amendment. New Jersey argues — and the District Court held — that the justifiable need re *444 quirement does not burden conduct protected by the Second Amendment because that right has no application beyond the confines of one’s home. This view is based on an incorrect reading of Heller and McDonald, both of which indicate that the Second Amendment extends beyond the home.
First, Heller engaged in significant historical analysis on the meaning of the text of the Second Amendment, specifically focusing on the words “keep” and “bear” as codifying distinct rights. See Heller, 554 U.S. at 582-84, 128 S.Ct. 2783. The Court defined “keep arms” as to “have weapons,” id. at 582, 128 S.Ct. 2783, and to “bear arms” as to “wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person,” id. at 584, 128 S.Ct. 2783 (citation and alterations omitted). To speak of “bearing” arms solely within one’s home not only would conflate “bearing” with “keeping,” in derogation of the Court’s holding that the verbs codified distinct rights, but also would be awkward usage given the meaning assigned the terms by the Supreme Court. See Moore, 702 F.3d at 936 (“The right to ‘bear’ as distinct from the right to ‘keep’ arms is unlikely to refer to the home. To speak of ‘bearing’ arms within one’s home would at all times have been an awkward usage. A right to bear arms thus implies a right to carry a loaded gun outside the home.”).
In addition, the Heller Court repeatedly noted that the Second Amendment protects an inherent right to self-defense, see 554 U.S. at 599, 128 S.Ct. 2783 (“self-defense ... was the central component of the right itself’ (emphasis in original)); id. at 628, 128 S.Ct. 2783 (“[T]he inherent right of self-defense has been central to the Second Amendment right.”), and consistently employed language referring to a more general right to self-defense than one confined to the home. For example, the Court described the Amendment’s operative clause — “to keep and bear arms”— as “guaranteeing] the individual right to possess and carry weapons in case of confrontation.” Id. at 592, 128 S.Ct. 2783. The Court also defined “bear arms” to include being “armed and ready for offensive or defensive action in a case of conflict with another person.” Id. at 584,128 S.Ct. 2783. Obviously, confrontations and conflicts “are not limited to the home.” Moore, 702 F.3d at 936.
Moreover, while the Court noted that “the need for defense of self, family, and property is most acute” in the home, Heller, 554 U.S. at 628,128 S.Ct. 2783 (emphasis added), “that doesn’t mean it is not acute outside the home,” Moore, 702 F.3d at 935. Instead, it “suggests] that some form of the right applies where that need is not ‘most acute.’ ” United States v. Masciandaro, 638 F.3d 458, 468 (4th Cir.2011) (Niemeyer, J., concurring). Were it otherwise, there would be no need for the modifier “most.” This reasoning is consistent with the Supreme Court’s historical understanding of the right to keep and bear arms as “an individual right protecting against both public and private violence,” such as in cases of armed resistance against oppression by the Crown. Heller, 554 U.S. at 594, 128 S.Ct. 2783; see also id. at 592-95, 128 S.Ct. 2783.
Furthermore, Heller also recognized that the right to bear arms was understood at the founding to “exist not only for self-defense, but also for membership in a militia and for hunting, neither of which is a home-bound activity.” Masciandaro, 638 F.3d at 468 (Niemeyer, J., concurring) (citing Heller, 554 U.S. at 598-99, 128 S.Ct. 2783). Likewise, when the Court acknowledged that the Second Amendment right was not unlimited, it listed as presumptive *445 ly lawful regulations those “laws forbidding the carrying of firearms in sensitive places such as schools and government buildings.” Heller, 554 U.S. at 626, 128 S.Ct. 2783 (emphasis added). “If the Second Amendment right were confined to self-defense in the home, the Court would not have needed to express a reservation for ‘sensitive places’ outside of the home.” Masciandaro, 638 F.3d at 468 (Niemeyer, J., concurring) (emphasis in original).
Most importantly, the McDonald Court described the holding in Heller as encompassing a general right to self-defense. The very first sentence of McDonald states: “Two years ago, in District of Columbia v. Heller, we held that the Second Amendment protects the right to keep and bear arms for the purpose of self-defense, and we struck down a District of Columbia law that banned the possession of handguns in the home.” McDonald, 130 S.Ct. at 3026 (citation omitted). Describing the holding this way — first establishing the legal principle embodied in the Second Amendment and then explaining how it was applied — demonstrates that the legal principle enunciated in Heller is not confined to the facts presented in that case.
Advocates of a home-bound Second Amendment, including New Jersey and the District Court, argue that Heller’s recognition of an individual Second Amendment right of self-defense was inextricably tied to the home. See Appellee Br. 15-16; Piszczatoski, 840 F.Supp.2d at 821-22. They cite statements in Heller such as the directive that the District of Columbia must allow Heller “to register his handgun and must issue him a license to carry it in the home.” Heller, 554 U.S. at 635, 128 S.Ct. 2783 (emphasis added). Also, they note that Heller purposely left unclear the entire universe of Second Amendment law: “And whatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.” Id. (emphasis added). Finally, they cite Heller’s statement that the Second Amendment is “not a right to keep and carry any weapon whatsoever in any manner-whatsoever and for whatever purpose.” Id. at 626, 128 S.Ct. 2783^
These arguments prove too much. In making these comments regarding the home, the Court was merely applying the Second Amendment to the facts at issue in the case before it. Heller challenged the District of Columbia’s prohibition on guns in the home, not its prohibitions on public carry. The application of the law to the facts does not vitiate the Court’s articulation of the right to keep and bear arms as a general right of self-defense.
Although the majority declines to determine. whether the Second Amendment extends outside the home, see Maj. Typescript at 431, my view that the Second Amendment extends outside of the home is hardly novel. Indeed, the only court of appeals to squarely address the issue has so held. See Moore, 702 F.3d at 942 (“The Supreme Court has decided that the amendment confers a right to bear arms for self-defense, which is as important outside the home as inside.”). In addition, we and other courts of appeals have acknowledged in dicta that the Second Amendment applies beyond the home. See Marzzarella, 614 F.3d at 92 (“At its core, the Second Amendment protects the right of law-abiding citizens to possess non-dangerous wfeapons for self-defense in the home. And certainly, to some degree, it must protect the right of law-abiding citizens to possess firearms for other, as-yet-undefined, lawful purposes.” (internal citations and footnote omitted)); see also Kachal'sky, 701 F.3d at 89 (“Although the Supreme Court’s cases applying the Second Amendment have arisen only in connection *446 with prohibitions on the possession of firearms in the home, the Court’s analysis suggests ... that the Amendment must have some application in the very different context of the, public possession of firearms.” (emphasis in original)); Masciandaro, 638 F.3d at 467 (Niemeyer, J., concurring).
In light of these precedents, I disagree with the majority’s assertion that the Seventh Circuit “may have read Heller too broadly” in Moore. Maj. Typescript at 431. For as I have explained, other courts, including ours, have read Heller the same way. See Marzzarella, 614 F.3d at 92; see also Kachalsky, 701 F.3d at 89. In addition, the majority does not support its criticism of Moore with anything but language from a previous Seventh Circuit case, United States v. Skoien, 614 F.3d 638 (7th Cir.2010) (en banc), that warned readers “not to treat' Heller as containing broader holdings than the Court set out to establish: that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense.” Id. at 640, 128 S.Ct. 2783; see Maj. Typescript at 431. Although the majority places its emphasis in that passage on the words “at home,” perhaps the better place for emphasis is on the words “one of which,” especially considering the Skoien court’s very next sentence: “What other entitlements the Second Amendment creates ... were left open.” Skoien, 614 F.3d at 640. More importantly, however, it is incongruous for the majority to find it only “possible” to conclude that Heller implies a right to bear arms beyond the home when we have previously indicated that such a right “must” exist, at least “to some degree.”[12] Marzzarella, 614 F.3d at 92; see Maj. Typescript at 430.
In sum, interpreting the Second Amendment to extend outside the home is merely a commonsense application of the legal principle established in Heller and reiterated in McDonald: that “the Second Amendment protects the right to keep and bear arms for the purpose of self-defense.” McDonald, 130 S.Ct. at 3026. Because the need for self-defense naturally exists both outside and inside the home, I would hold that the Second Amendment applies outside the home.
IV
Having concluded that the Second Amendment extends outside the home, I now address the majority’s holding that New Jersey’s justifiable need requirement does not burden conduct protected by the Second Amendment because it is a longstanding regulation exempt from Second Amendment scrutiny.
In Heller, the Supreme Court cautioned that “nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.” 554 U.S. at 626-27, 128 S.Ct. 2783. Calling these “presumptively lawful regulatory measures,”[13] the Court also noted that the list was not exhaustive. Id. at 627 n. 26, 128 S.Ct. 2783. As we noted in Marzzarella, however, “the approach for *447 identifying these additional restrictions is also unsettled.” 614 F.3d at 93. Observing that “Heller’s identified exceptions all derived from historical regulations,” but acknowledging that “it is not clear that pre-ratification presence is the only avenue to a categorical exception,” we concluded that “prudence counsels caution when extending these recognized exceptions to novel regulations unmentioned by Heller.” Id.; see also United States v. Huet, 665 F.3d 588, 602 (3d Cir.2012).
Our hesitance to recognize additional exceptions is unsurprising in light of the fact that by doing so we are determining that a certain regulation is completely outside the reach of the Second Amendment, not merely that the regulation is a permissible burden on the Second Amendment right. See Marzzarella, 614 F.3d at 91. Accordingly, it is also unsurprising that courts have declined to find that regulations not mentioned in Heller fall within its “longstandingness” exception without a clear historical pedigree. See, e.g., Heller v. District of Columbia, 670 F.3d 1244, 1255 (D.C.Cir.2011) (Heller II) (declining to recognize as longstanding a multitude of District of Columbia handgun registration requirements, including laws requiring reregistration after three years- and requiring applicants to demonstrate knowledge about firearms, be fingerprinted and photographed, take firearms training or safety courses, meet a vision requirement, and submit to a background check every six years); United States v. Chester, 628 F.3d 673, 681 (4th Cir.2010) (declining to recognize as longstanding a law prohibiting firearm possession by domestic violence misdemeanants because historical data was inconclusive); Marzzarella, 614 F.3d at 95 (declining to recognize as longstanding a law prohibiting possession of unmarked firearms). And even if some of these courts eventually uphold the law at issue, they do so by subjecting it to constitutional scrutiny. See, e.g., Marzzarella, 614 F.3d at 95-101. By contrast, courts that have upheld laws by virtue of their longstandingness do so on the basis that the court “do[es] not have to broaden any of Heller’s presumptively valid categories to find that the conduct alleged ... is outside the scope of Second Amendment protection.” Huet, 665 F.3d at 603; see also United States v. Barton, 633 F.3d 168, 172 (3d Cir.2011).
Despite the caution that we and other courts have counseled, the majority today holds that New Jersey’s justifiable need requirement is a longstanding exception to the Second Amendment right to bear arms. It does so mostly on the basis that some form of need requirement has existed in New Jersey since 1924. See Maj. Typescript at 432-33. But the majority’s analysis ignores the major changes that New Jersey’s law has undergone in the decades since 1924 and also misapprehends the legal standards for deeming a law longstanding such that it is beyond the scope of the Second Amendment. A detailed review of the history of New Jersey’s gun laws is necessary to explain my first disagreement with my colleagues. I then turn to their misapprehension of Heller’s requirements.
A
In 1905, New Jersey enacted its first general ban on carrying concealed firearms. Compiled Statutes of New Jersey, Vol. II. 1759 (Soney & Sage 1911). Although the law contained an exception whereby a local official could grant a permit, there were no standards for issuance.[14] Id. In 1924, the New Jersey legis *448 lature revised the law to incorporate the word “need” for the first time. As amended, the statute provided that concealed carry permits would be issued only after the issuing officer was “satisfied of the sufficiency of the application, and of the need of such person carrying concealed upon his person, a revolver, pistol, or other firearm.” Cumulative Supplement to the Compiled Statutes of New Jersey, 1911-1924 (Volume I) 844 (Soney & Sage 1925). Violation of the permitting requirement was a misdemeanor. And critically for our purposes, the permitting requirement applied only to the concealed carry of firearms. Open carry was still allowed without a permit (and thus without any showing of need). See State v. Repp, 129 N.J.Super. 588, 324 A.2d 588, 592 (App.Div.1974) (Kole, J.S.C, concurring), rev’d 69 N.J. 222, 352 A.2d 260 (1976) (reviewing history).
In 1966, New Jersey made wholesale revisions to its firearms permit laws. For the first time, the State extended the permitting requirement to open carry as well as concealed carry. See N.J. Stat. Ann. § 2A:151-41 (1966). In addition, the 1966 Act eliminated a single permit to carry and replaced it with three distinct types of firearms permits: (1) a permit to purchase, which was required to acquire a pistol or revolver; (2) a firearms purchaser identification card to acquire a rifle or shotgun; and (3) a permit to carry a pistol or revolver. See N.J. Stat. Ann. §§ 2A:151-32-36, 41-45 (1966); Repp, 324 A.2d at 592 (Kole, J.S.C, concurring) (reviewing history). The 1966 Act also made possession of a handgun without a permit a felony.
As for the need requirement, it was first defined in Siccardi v. State, 59 N.J. 545, 284 A.2d 533 (1971).[15] Although the court acknowledged that “need” was somewhat vague, the court defined it as “an urgent necessity for carrying guns for self-protection.” Id. at 540.
In 1979, the law was amended to its current form, using the phrase “justifiable need” rather than merely “need.” See N.J. Stat. Ann. § 2C:58^4(c) (1979); In re Friedman, 2012 WL 6049075, at *4 (N.J.Super.Ct.App.Div. Dec. 6, 2012) (not precedential) (reviewing history). The New Jersey courts have not ascribed any significance to that change of phrasing, however. See Doe v. Dover Twp., 216 N.J.Super. 539, 524 A.2d 469, 470 (App. Div.1987) (noting that the change from “need” to “justifiable need” was “intended basically to restate the repealed statutes which were ‘carried forward without substantial change’ ” (quoting 2 Final Report of the New Jersey Criminal Law Revision Commission 370 (1971))).
In 1990, the New Jersey Supreme Court clarified that the “urgent necessity” formulation articulated in Siccardi requires applicants to show “specific threats or previous attacks demonstrating a special danger to the applicant’s life that cannot be avoided by other means” as opposed to “[g]eneralized fears for personal safety” or “a need to protect property alone.” Preis, 573 A.2d at 152. The “urgent necessity’ test laid out in Siccardi and clarified in Preis remains the law to the present day. See, e.g., Pantano, 60 A.3d at 510.
B
One facet of New Jersey’s history of firearm regulation is particularly important to the longstandingness inquiry. Until 1966, New Jersey allowed the open carry of firearms without a permit. Only *449 concealed carry without a permit issued upon a showing of need has been banned since 1924. This distinction is significant because courts have long distinguished between these two types of caray, holding that although a State may prohibit the open or concealed carry of firearms, it may not ban both because a complete prohibition on public carry violates the Second Amendment and analogous state constitutional provisions. For example, in State v. Reid, 1 Ala. 612 (1840), the Supreme Court of Alabama upheld a prohibition on the concealed carrying of “any species of fire arms” but cautioned that the State’s ability to regulate firearms was not unlimited: “A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional.” Id. at 614, 616-17. Relying on Reid, the Georgia Supreme Court held that a statute prohibiting the carrying of concealed pistols was unconstitutional insofar as it also “contains a prohibition against bearing arms openly.” Nunn v. State, 1 Ga. 243, 251 (1846) (emphasis in original). The Louisiana Supreme Court adopted a similar interpretation in State v. Chandler, 5 La.Ann. 489 (1850). There, the court held that a law prohibiting the carrying of concealed weapons was constitutional because “[i]t interfered with no man’s right to carry arms ... in full open view.” Id. at 490 (internal quotation marks omitted). Finally, the Tennessee Supreme Court held that although the State could prohibit concealed carry, it could not prohibit all carrying of weapons. Andrews v. State, 50 Tenn. 165, 180-82, 186-88 (1871).
The United States Supreme Court in Heller cited Nunn, Chandler, and Andrews as relevant precedents in determining the historical meaning of the Second Amendment, going so far as to say that the Georgia Supreme Court’s opinion in Nunn “perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause.!’ Heller, 554 U.S. at 612, 128 S.Ct. 2783; see also id. at 613, 128 S.Ct. 2783. Notably, the Court later described the laws struck down in Reid, Nunn,. and Andrews as “laws [that] have come close to the severe restriction of the District’s handgun ban,” which was struck down as well. Id. at 629, 128 S.Ct. 2783.
The crux of these historical precedents, endorsed by the Supreme Court, is that a prohibition against both open and concealed carry without a permit is different in kind, not merely in degree, from a prohibition covering only one type of carry. After all, if a State prohibits only one type of carry without a permit, an opportunity for the free exercise of Second Amendment rights still exists. That opportunity disappears when the prohibition is extended to both forms of carry.
The same logic applies to the 1966 New Jersey law. Prior to that year, New Jersey prohibited only concealed carry without a permit. Accordingly, individuals were able to exercise their Second Amendment rights without first obtaining permission from the State. By enacting a prohibition on open carry without a permit in the 1966 law, New Jersey eliminated that right.
Thus, when the majority identifies 1924 as the operative date for its longstandingness inquiry, it does so in derogation of historical precedents, cited approvingly by the Supreme Court in Heller, that draw an important distinction between concealed and open carry. Under these precedents, when New Jersey eliminated the ability of its residents to openly carry arms without a permit in 1966, it was, as a constitutional matter, enacting an entirely new law.
Regardless • of whether we use 1924 or 1966 as the operative date, however, the *450 majority misapprehends the legal standards applicable to the longstandingness analysis. Because that analysis demonstrates that New Jersey’s justifiable need requirement is not sufficiently grounded in history and- tradition even if retroactive to 1924, I yvould hold that the requirement is not exempt from Second Amendment scrutiny.
C
As we observed in Marzzarella, “Heller’s identified exceptions all derived from historical regulations.” 614 F.3d at 93. Therefore, the majority concentrates on Heller’s recognition of “prohibitions on the possession of firearms by felons,” Heller, 554 U.S. at 626, 128 S.Ct. 2783, as the benchmark against which it compares the justifiable need requirement’s pedigree. Maj. Typescript at 433-34 & n. 11. The majority cites our opinion in United States v. Barton, in which we explained that the “first federal statute disqualifying felons from possessing firearms was enacted in 1938” and that “Congress did not bar nonviolent felons from possessing guns until 1961.” 633 F.3d at 173; see Maj. Typescript at 434 n. li. According to my colleagues, because “a firearms regulation may be ‘longstanding’ and ‘presumptively lawful’ even if it was only first enacted in the 20th century,” Maj. Typescript at 434 n. 11, New Jersey’s justifiable need requirement, which, according to their interpretation, has existed since 1924, satisfies the standard. But see Heller II, 670 F.3d at 1260 & n. * (finding that a District of Columbia law prohibiting semi-automatic rifles and large-capacity magazines was not longstanding even though the District had banned such weapons and ammunition since 1932 and Michigan had enacted a similar ban in 1927).
I perceive several problems with the majority’s analysis. First, it ignores the fact that, as we explained in Barton, the federal felon-in-possession laws have historical pedigrees that originated with the founding generation. Immediately after discussing the dates of enactment of the federal felon-in-possession laws, we noted that “[d]ebates from the Pennsylvania, Massachusetts, and New Hampshire ratifying conventions, which were considered ‘highly influential’ by the Supreme Court in Heller, also confirm that the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses.” Barton, 633 F.3d at 173 (quoting Heller, 554 U.S. at 604, 128 S.Ct. 2783) (internal citation omitted); see also Skoien, 614 F.3d at 640 (“Many of the states [in the eighteenth century], whose own constitutions entitled their citizens to be armed, did not extend this right to persons convicted of crime.”).
Although “a regulation can be deemed ‘longstanding’ even if it cannot boast a precise founding-era analogue,” Nat’l Rifle Ass’n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 196 (5th Cir.2012), Heller requires, at a minimum, that a regulation be rooted in history. Otherwise, there would have been no point for the Court to state that it would “expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us,” Heller, 554 U.S. at 635, 128 S.Ct. 2783, and no reason for the Court to describe the exceptions as “longstanding,” id. at 626,128 S.Ct. 2783.[16]
*451 Perhaps recognizing that some historical support is required, the majority attempts to root New Jersey’s justifiable need requirement in history by citing the Second Circuit’s decision in Kachalsky for the proposition that “[i]n the 19th century, most states enacted laws banning the carrying of concealed weapons, and some states went even further than prohibiting the carrying of concealed weapons banning coneealable weapons (subject to certain exceptions) altogether whether carried openly or concealed.” Maj. Typescript at 433 (citing Kachalsky, 701 F.3d at 95-96) (alterations and internal quotation marks omitted). As explained in the previous section, however, laws that banned concealed carry alone have little bearing on laws that now regulate both concealed and open carry. In addition, the laws that the majority cites which purportedly banned both open and cóncealed carry altogether actually provide little support. See Maj. Typescript at 433 (citing Ch. 96, §§ 1-2, 1881 Ark. Acts at 191-92; Act of Dec. 2, 1875, ch. 52, § 1, 1876 Wyo. Terr. Comp. Laws, at 352; Ch. 13, § 1,1870 Term. Acts at 28; Act of Apr. 12, 1871, ch. 34, § 1, 1871 Tex. Gen. Laws at 25). The statutes in Arkansas, Texas, and Tennessee were upheld only to the extent that they prohibited weapons that were not “arms” within the meaning of the Second Amendment or their state constitutional analogues (which were defined as the arms of a militiaman or a soldier). See Fife v. State, 31 Ark. 455, 461 (1876); Andrews, 50 Tenn. at 186-87; English v. State, 35 Tex. 473, 473 (1871); see also Kachalsky, 701 F.3d at 91 n. 14. To the extent that the state laws prohibited the carry of weapons used in war, such as a full-sized pistol or revolver, they were struck down. See Wilson v. State, 33 Ark. 557, 559-60 (1878); Fife, 31 Ark. at 461; Andrews, 50 Tenn. at 186-88. As one commentator has noted, “Heller stated that bans on concealed carry of firearms are so traditionally recognized that they must be seen as constitutionally permissible.... The same cannot, however, be said about general bans on carrying firearms in public, which prohibit open as well as concealed carrying.” Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self Defense: An Analytical Framework and a Research Agenda^ 56 UCLA L.Rev. 1443, 1516 (2009) (footnote omitted).
The greatest flaw I perceive in the majority’s opinion, however, is that the longstandingness analysis is conducted at too high a level of generality. Rather than determining whether there is a longstanding tradition of laws that condition the issuance of permits on a showing of a greater need for self-defense than that which exists among the general public, the majority chooses as its reference point laws that have regulated the public carry of firearms. This is “akin to saying that because the government traditionally could prohibit defamation, it can also prohibit speech criticizing government officials.” Heller II, 670 F.3d at 1294 (Kavanaugh, J., dissenting). In the First Amendment context, when determining whether a regulation is longstanding, the Supreme Court has looked to that particular type of regulation, not to a broader general category. See Brown v. Entm’t Merchants Ass’n, — U.S. -, 131 S.Ct. 2729, 2736, 180 L.Ed.2d 708 (2011) (considering a First Amendment challenge to a ban on sale of violent video games: “California’s argument would fare better if there were a longstanding tradition in this country of specially restricting children’s access to depictions of violence, but there is none”); *452 United States v. Stevens, 559 U.S. 460, 130 S.Ct. 1577, 1585, 176 L.Ed.2d 435 (2010) (considering a First Amendment challenge to a ban on depictions of animal cruelty: “the prohibition of animal cruelty itself has a long history in American law, starting with the early settlement of the Colonies. But we are unaware of any similar tradition excluding depictions of animal cruelty from ‘the freedom of speech’ codified in the First Amendment” (citations omitted) (emphasis in original)). Demonstrating that there has been a longstanding tradition of regulating the public carry of firearms tells us nothing about whether New Jersey’s justifiable need requirement itself is longstanding.
Finally, the majority’s reference to New York’s permitting scheme, which requires a showing of “proper cause” and was enacted in 1911, provides no support for its conclusion that New Jersey’s justifiable need requirement qualifies as longstanding for purposes of the Second Amendment. See Maj. Typescript at 433-34. The Second Circuit in Kachalslcy upheld New York’s law because it survived intermediate scrutiny, not because it evaded Second Amendment cognizance on account of its longstandingness. In fact, the Second Circuit found that the cited sources — including the Arkansas, Tennessee, Texas, and Wyoming statutes cited by the majority— “do not directly address the specific question before us: Can New York limit handgun licenses to those demonstrating a special need for self-protection? Unlike the cases and statutes discussed above, New York’s proper cause requirement does not operate as a complete ban on the possession of handguns in public.” Kachalslcy, 701 F.3d at 91. As a result, the court declined to find that the law was a longstanding exception to the Second Amendment.
D
In light of the foregoing, regardless of whether New Jersey’s justifiable need requirement dates to 1924 or 1966 for purposes of the inquiry, there is not a sufficiently longstanding tradition of regulations that condition the issuance of permits on a showing of special need for self-defense to uphold New Jersey’s law on that basis. As we and other courts have stated, we must be cautious in recognizing new exceptions to the Second Amendment. After all, finding that a regulation is longstanding insulates it from Second Amendment scrutiny altogether; it is as good as saying that individuals do not have a Second Amendment right to engage in conduct burdened by that regulation. Accordingly, unless history and tradition speak clearly, we should hesitate to recognize new exceptions. Because there is no such history and tradition here, I would hold that New Jersey’s justifiable need requirement is not a longstanding regulation immune from Second Amendment scrutiny.
V
Having concluded that New Jersey’s justifiable need requirement burdens conduct protected by the Second Amendment, I now turn to Marzzarella’s second prong, which requires us to evaluate the law using some form of means-end scrutiny. Although I agree with the majority that intermediate scrutiny applies, I disagree with its conclusion that New Jersey’s justifiable need requirement satisfies that standard.[17]
*453 A
Under intermediate scrutiny, the State must assert a significant, substantial or important interest and there must be a reasonable fit between the asserted interest and the challenged regulation. Marzzarella, 614 F.3d at 98. “The regulation need not be the least restrictive means of serving the interest, but may not burden more [conduct] than is reasonably necessary.” Id. The State bears the burden of establishing both of these requirements. Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); Chester, 628 F.3d at 683.
Because Appellants rightly acknowledge that New Jersey’s interest in public safety is significant, substantial, and important, I turn to the question of “fit.” “[S]ince the State bears the burden of justifying its restrictions, it must affirmatively establish the reasonable fit we require.” Fox, 492 U.S. at 480, 109 S.Ct. 3028. Accordingly, we may consider only the reasons and the evidence proffered by the State in evaluating the fit between the challenged law and the State’s interest. The sole reason articulated by New Jersey in this case is that the justifiable need requirement is “designed to combat the dangers and risks associated with the misuse and accidental use of handguns.” Appellee Br. 34. According to New Jersey, because those risks “are borne not only by the person seeking the permit, but by the citizenry he encounters,” limiting permits to carry a handgun to those who can show a justifiable need to do so serves the State’s interest in public safety. Id.
At the outset, we should emphasize that the justifiable need requirement itself, not the State’s permitting law in general, is at issue. The majority apparently disagrees insofar as its opinion focuses on whether permitting schemes in general further an interest in public safety. By doing so, I submit that the majority misapprehends the regulation under review. Appellants take no issue with permits in general or with the other objective requirements that an applicant must satisfy prior to obtaining a handgun carry permit, such as background checks, safety courses, and qualification tests. Rather, the regulation at issue is the requirement to show justifiable need, that is, that' the applicant has a special need for self-defense greater than that which exists among the general public. Preis, 573 A.2d at 152. Accordingly, our inquiry must focus on that requirement. To be precise, we must ask whether the State has justified its conclusion that those with a special need for self-defense are less likely to misuse or accidentally use a handgun than those who do not have a special need.
Although the State must show only a “reasonable” fit, New Jersey comes nowhere close to making the required showing. Indeed, New Jersey has presented no evidence as- to how or why its interest in preventing misuse or accidental use of handguns is furthered by limiting possession to those who can show a greater need for self-defense than the typical citizen.[18]
The majority excuses the State for this evidentiary void by reference to the fact that Heller was not decided until 2008 and that the Second Amendment had not been incorporated against the States until 2010. *454 “Simply put,” the majority states, “New Jersey’s legislators could not have known that they were potentially burdening protected Second Amendment conduct, and as such we refuse to hold that the fit here is not reasonable merely because New Jersey cannot identify a study or tables of crime statistics upon which it based its predictive judgment.” Maj. Typescript at 438.
Even if one were to ignore the fact that people bore and desired to bear firearms in New Jersey in the decades prior to Heller, the lack of legislative history surrounding the State’s enactnient of the justifiable need requirement is not the chief problem with the State’s showing. To be clear, New Jersey has provided no evidence at all to support its proffered justification, not just no evidence that the legislature considered at the time the, need requirement was enacted or amended. The majority errs in absolving New Jersey of its obligation to show fit. Our role is to evaluate the State’s proffered evidence, not to accept reflexively its litigation position. See Heller II, 670 F.3d at 1259 (holding that the governmént had not borne its burden under intermediate scrutiny because “the District needs to present some meaningful evidence, not mere assertions, to justify its predictive judgments”); Chester, 628 F.3d at 683 (holding that the government had not borne its burden under intermediate scrutiny because “[t]he government has offered numerous plausible reasons-why the disarmament of domestic violence misdemeanants is substantially related to an important government goal; however, it has not attempted to offer sufficient evidence to establish a substantial relationship between [18 U.S.C] § 922(g)(9) and an important governmental goal” (emphasis in original)). “Without pointing to any study, empirical data, or legislative findings,” New Jersey submits merely “that the fit [i]s a matter of common sense.” United States v. Carter, 669 F.3d 411, 419 (4th Cir.2012). Under these circumstances, the State has not carried its burden to “affirmatively establish the reasonable fit we require.” Fox, 492 U.S. at 480, 109 S.Ct. 3028; see, e.g., Carter, 669 F.3d at 419; Heller II, 670 F.3d at 1259; Chester, 628 F.3d at 683.
Even were we to deem adequate the State’s proffered reasons alone, without any supporting evidence, there still would be no reasonable fit between the justifiable need requirement and the State’s interest in “combating the dangers and risks associated with the misuse and accidental use of handguns.” Appellee Br. 34. The fact that one has a greater need for self-defense tells us nothing about whether he is less likely to misuse or accidentally use handguns. This limitation will neither make it less likely that those who meet the justifiable need requirement will accidentally shoot themselves or others, nor make it less likely that they will turn to a life of crime. Put simply, the solution is unrelated to the problem it intends to solve. Our inquiry here focuses on the way New Jersey has sought to address the societal ills of misuse and accidental use (by giving permits only to those who have a greater need for self-defense), not on whether New Jersey has an interest in combating these problems. Limiting permits to those who can show a greater need for self-defense than the public at large does not make it less likely that misuse and accidental use will occur. In fact, that proposition is counterintuitive. Misuse and accidental use presuppose the active handling of handguns and it seems odd to suggest that one who obtains a handgun carry permit because he is in imminent danger is less likely to handle a gun than one who obtains a carry permit because he might want to exercise that right in the future even though he perceives no present danger. .
*455 An example demonstrates the absence of a fit between the justifiable need requirement and reducing misuse or accidental use of handguns. Imagine that a 21-year-old with no criminal record is shot in the leg while leaving his home in a high-crime area. Citing the portion of the justifiable need requirement that allows handgun permit issuance to those who have suffered from previous attacks, he applies for and is granted a permit to carry a handgun. Unbeknownst to the permitting officials, however, the 21-year-old is a street-level drug dealer who wants the gun to retaliate against the rival who shot him. It borders on the absurd to believe that this 21-year-old is less likely to misuse or accidentally use a handgun than a reserve sheriffs deputy who wishes to carry a gun for self-defense while off duty, like Appellant Finley Fenton; or a civilian FBI employee who received specific information that a terrorist organization might target him or his family, like former Appellant Daniel Piszczatoski; or an owner of an ATM restocking company who routinely carries large amounts of cash, like Appellant John Drake.
The counterintuitiveness of the idea that limiting handguns to those who have a special need for self-defense reduces misuse or accidental use is borne out by the experience of other States that issue handgun permits on a shall-issue basis, which is what New Jersey’s Handgun Permit Law would look like without the justifiable need requirement. For example, Florida has issued 2,525,530 handgun carry licenses since 1987. Concealed Weapon or Firearm License Summary Report, http:// liegweb.doacs.state.fl.us/stats/cw_monthly. pdf (last visited July 16, 2013). To date, Florida has revoked only 168 licenses-0.00665% — for crimes involving firearms. Id. In Texas, of the 63,679 criminal convictions (not just those in which firearms were used) in 2011, only 120-0.1884%— were attributed to individuals licensed to carry handguns. Conviction Rates for Concealed Handgun License Holders, http://www.txdps.state.tx.us/RSD/CHL/ ReportsZConvictionRatesReport2011.pdf (last visited July 16, 2013).
In addition, although not all States keep detailed statistics on crimes committed by permit holders, many States keep statistics on permit revocations. For instance, Michigan issued 87,637 permits for the year ending June 30, 2011, but revoked only 466 of them. Concealed Pistol Licensure Annual Report, http://www.michigan. gov/documents/msp/2011_CPL_Report_ 376632_7.pdf (last visited July 16, 2013). Tennessee issued 94,975 handgun carry permits in 2011, suspended only 896, and revoked just 97. Tennessee Handgun Carry Permit Statistics, http://www.tn. gov/safety/stats/DL_Handgun/Handgun/ HandgunReport2011Full.pdf (last visited July 16, 2013). North Carolina has issued 228,072 permits in the last 15 years but has revoked only 1,203. North Carolina Concealed Handgun Permit Statistics by County, http://www.ncdoj.gov/CHPStats. aspx (last visited July 16, 2013). The reasons for these revocations are unclear, but even if we assumed that all of them were because of misuse or accidental use of handguns, the rate in Michigan and North Carolina is 0.5%, and in Tennessee it is 0.1%.
Irrespective of what other States have done, New Jersey has decided that fewer handguns legally carried in public means less crime. And despite its assertion that the justifiable need requirement is specifically targeted to reducing misuse and accidental use, it is obvious that the justifiable need requirement functions as a rationing system designed to limit the number of handguns carried in New Jersey. The New Jersey courts have admitted as much. See, e.g., State v. Valentine, 124 N.J.Super. 425, 307 A.2d 617, 619 (App.Div.1973) *456 (“[T]he overriding philosophy of our Legislature is to limit the use of guns as much as possible.”); see also Siccardi, 284 A.2d at 540 (“[Widespread handgun possession in the streets, somewhat reminiscent of frontier days, would not be at all in the public interest.”). Even assuming that New Jersey is correct to conclude that fewer guns means less crime, a rationing system that burdens the exercise of a fundamental constitutional right by simply making that right more difficult to exercise cannot be considered reasonably adapted to a governmental interest because it burdens the right too broadly. See Ward v. Rock Against Racism, 491 U.S. 781, 783, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) (under intermediate scrutiny, the means chosen to achieve the desired governmental objective may not be “substantially broader than necessary”). The regulation must be more targeted than that to meet intermediate scrutiny.[19]
Those who drafted and ratified the Second Amendment were undoubtedly aware that the right they were establishing carried a risk of misuse, and States have considerable latitude to regulate the exercise of the right in ways that will minimize that risk. But States may not seek to reduce the danger by curtailing the right itself. This point is made starker by the fact that the other requirements in New Jersey’s permit law display a closer fit with the articulated interest of reducing misuse and accidental use. For example, New Jersey conducts a criminal background check and requires applicants to complete a training course, pass a test of the State’s laws governing the use of force, and provide qualification scores from test firings administered by a certified instructor. Appellants have challenged none of these regulations.
In sum, New Jersey has not carried its burden to demonstrate that the justifiable need requirement is reasonably adapted to its interest in reducing the misuse or accidental use of handguns. Accordingly, the justifiable need requirement fails intermediate scrutiny and contravenes the Second Amendment.
B
The majority reaches the opposite conclusion by stressing deference to the New Jersey legislature and by declining to examine the justifiable need requirement itself in favor of examining the permitting requirement as a whole. Maj. Typescript at 437 (quoting Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 195, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (Turner II)). Having already addressed the majority’s error with respect to the level of generality of its analysis, a few words about deference are in order.
Although the majority is correct that we “ ‘accord substantial deference to the predictive judgments’ of the legislature, [New Jersey] is not thereby ‘insulated from meaningful judicial review.’ ” Heller II, 670 F.3d at 1259 (quoting Turner II, 520 U.S. at 195, 117 S.Ct. 1174, and Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 666, 114 S.Ct. 2445,129 L.Ed.2d 497 (1994) {Turner I) (controlling opinion of Kennedy, J.)). “Rather, we must ‘assure that, in formulating its judgments, the legislature has drawn reasonable inferences based on substantial evidence.’ ” Id. (quoting Turner II, 520 U.S. at 195, 117 S.Ct. 1174) (alteration *457 omitted). By deferring absolutely to the New Jersey legislature, the majority abdicates its duty to apply intermediate scrutiny and effectively applies the rational basis test, contrary to the Supreme Court’s explicit rejection of that test in the Second Amendment context. Heller, 554 U.S. at 628 n. 27, 128 S.Ct. 2783.
Such deference is not consistent with intermediate scrutiny because that standard places the burden of establishing both elements of its test — an important interest and a reasonable fit that does not burden more conduct than reasonably necessary — on the State. See Fox, 492 U.S. at 480, 109 S.Ct. 3028. The majority says that “New Jersey legislators ... have made a policy judgment that the state can best protect public safety by allowing only those qualified individuals who can demonstrate a ‘justifiable need’ to carry a handgun to do so,” and says that this determination (and others that it notes) lead it to “refuse Appellants’ invitation to intrude upon the sound judgment and discretion of the State of New Jersey.” Maj. Typescript at 439, 439-40. Yet the majority never discusses whether those judgments violate the Constitution. It makes no mention of New Jersey’s articulated policy interest in reducing the misuse or accidental use of handguns, it says nothing about whether limiting handguns to those who can show a greater need for self-defense is reasonably related to that interest, and it does not adhere to the fact that the State bears the burden of proving the justifiable need requirement’s constitutionality.
It is also notable that the majority’s version of deference to the New Jersey legislature is akin to engaging in the very type of balancing that the Heller Court explicitly rejected. The majority states:
It is New Jersey’s judgment that when an individual carries a handgun in public for his or her own defense, he or she necessarily exposes members of the community to a somewhat heightened risk that they will be injured by that handgun. New Jersey has decided that this somewhat heightened risk to the public may be outweighed by the potential safety benefit to an individual with a “justifiable need” to carry a handgun.
Maj. Typescript at 439.
By deferring to New Jersey’s judgment that the justifiable need requirement is the provision that can best determine whether the individual right to keep and bear arms “outweighs” the increased risk to the community that its members will be injured by handguns, the majority employs an “‘interest-balancing inquiry that ‘asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute’s salutary effects upon other important governmental interests.’ ” Heller, 554 U.S. at 634, 128 S.Ct. 2783 (quoting id. at 689-90, 128 S.Ct. 2783 (Breyer, J., dissenting)). The Heller Court rejected this sort of balancing inquiry as inconsistent with the very idea of constitutional rights. Id. at 634-35, 128 S.Ct. 2783.
The majority’s failure to analyze the constitutional fit between the justifiable need requirement and New Jersey’s articulated interest in reducing the misuse or accidental , use of firearms is thus especially troubling. Only by engaging in a true fit analysis are we faithful both to the Supreme Court’s rejection of naked interest balancing and to its reminder that the Second Amendment is “not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.” Heller, 554 U.S. at 626, 128 S.Ct. 2783.
Gun violence is an intractable problem throughout the United States. In 2011 alone, 6,220 people were murdered by *458 handguns,[20] and although many of the perpetrators of handgun homicides undoubtedly were unlicensed criminals, it is safe to assume that some of the perpetrators were licensed to carry. New Jersey has sought to protect its citizens by reducing the number of guns carried in public. In the bygone era when the Bill of Rights acted as a check solely on federal power, New Jersey could regulate guns as it saw fit. In the post-incorporation era, however, New Jersey must comply with the Second Amendment.
Federal judges must apply the Constitution and the precedents of the Supreme Court regardless of what each judge might believe as a matter of policy or principle. See Texas v. Johnson, 491 U.S. 397, 420-21, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) (Kennedy, J., concurring) (“The hard fact is that sometimes we must make decisions we do not like. We make them because they are right, right in the sense that the law and the Constitution, as we see them, compel the result.”). No matter how laudable the end, the Supreme Court has long made clear that the Constitution disables the government from employing certain means to prevent, deter, or detect violent crime. See, e.g., United States v. Jones, — U.S. —-, 132 S.Ct. 945, 181 L.Ed.2d 911 (2012); Kennedy v. Louisiana, 554 U.S. 407, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008); Kyllo v. United States, 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001); Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); see also Heller II, 670 F.3d at 1296 (Kavanaugh, J., dissenting). And the Court has been equally clear that the courts must enforce constitutional rights even when they have “controversial public safety implications.” McDonald, 130 S.Ct. at 3045 (controlling opinion of Alito, J.); see also Heller, 554 U.S. at 636, 128 S.Ct. 2783 (“We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many amici who believe that prohibition of handgun ownership is a solution.... But the enshrinement of constitutional rights necessarily takes certain policy choices off the table.”). Because I am convinced that New Jersey’s justifiable need requirement unconstitutionally burdens conduct protected by the Second Amendment as interpreted in Heller and McDonald, I respectfully dissent.

. See Ark.Code Ann. §§ 5-73-120, 5-73-315; Fla. Stat. § 790.053(1); 720 111. Comp. Stat. 5/24-1; N.Y. Penal Law §§ 265.03(3), 400.00(2)(f); R.I. Gen.Laws §§ ll-47-8(a), 11-47-11(a); S.C.Code Ann. §§ 16-23-20(12), 23-31-215; Tex. Penal Code Ann. § 46.035(a).

. If one can lawfully possess a handgun, one can lawfully carry it concealed without a permit in Alaska, Arizona, Vermont, and Wyoming. Nicholas J. Johnson et al., Firearms Law and the Second Amendment 21 (2012). Although Montana requires a permit for concealed carrying of a handgun in cities and towns, concealed carrying of a handgun without a permit is allowed for "a person who is outside the official boundaries of a city or town or the confines of a logging, lumbering, mining, or railroad camp.” Mont.Code Ann. § 45-8-317(l)(i); see id. §§ 45-8-316(1), 45-8-321.

. See Ala.Code §§ 13A-11-50, 13A-11-73; Ark.Code Ann. § 5-73-315(a); Cal.Penal Code § 26150; Colo.Rev.Stat. § 18-12-105(2)(c); Conn.Gen.Stat. § 29-35(a); Del. Code Ann. tit. 11, § 1442; Fla. Stat. § 790.06; Ga.Code Ann. § 16-11-126; Haw.Rev.Stat. § 134-9; Idaho Code Ann. § 18-3302(7); Ind.Code § 35-47-2-1 (a); Iowa Code § 724.4(4)(i); Kan.Stat. Ann. § 21-6302(d)(8); Ky.Rev.Stat. Ann. § 527.020(4); La.Rev.Stat. Ann. § 40:1379.3; Me.Rev.Stat. tit. 25, § 2001-A; Md.Code Ann., Crim. Law § 4-203(b)(2); Mass. Gen.Laws ch. 269, § 10(a)(2); Mich. Comp. Laws § 750.227(2); Minn.Stat. § 624.714(la); Miss.Code Ann. §§ 45-9-101, 97-37-1(1); Mo.Rev.Stat. § 571.030(1), (4); Neb.Rev.Stat. § 28-1202(Z)(a), (2); Nev.Rev.Stat. §§ 202.350(l)(d)(3), 202.3657; N.H.Rev.Stat. Ann. § 159:4; N.J. Stat. Ann. § 2C:39-5(b); N.M. Stat. Ann. § 30-7-2(A)(5); N.Y. Penal Law §§ 265.03(3), 400.00(2)(f); N.C. Gen. Stat. § 14-269(al)(2); N.D. Cent.Code § 62.1-04-02; Ohio Rev.Code Ann. § 2923.12; Okla. Stat. tit. 21, §§ 1290.4, 1290.5; Or.Rev.Stat. §§ 166.250(l)(a), 166.260(l)(h); 18 Pa. Cons.Stat. Ann. § 6106(a)(1); R.I. Gen.Laws § ll-47-8(a); S.C.Code Ann. § 16-23-460(BXD; S.D. Codified Laws § 22-14-9; Tenn.Code Ann. § 39-17-1351; Tex. Gov't Code Ann. § 411.171 et seq.; Utah Code Ann. § 76-10-504; Va.Code Ann. § 18.2-308; Wash. Rev.Code § 9.41.050(l)(a); W. Va.Code § 61-7-3; Wis. Stat. § 941.23(2)(d).

. See Alaska Stat. § 18.65.700; Ark.Code Ann. § 5-73-309; Ariz.Rev.Stat. § 13-3112; Colo.Rev.Stat. § 18^12-203(1); Fla. Stat. § 790.06(2); Ga.Code Ann. § 16-11-129; Idaho Code Ann. § 18-3302(1); Ind.Code § 35-47-2-3; Iowa Code § 724.7(1); Kan. Stat. Ann. § 75-7c03; Ky.Rev.Stat. Ann. § 237.110(4); La.Rev.Stat. Ann. § 40:1379.3(A)(1); Me.Rev.Stat. tit. 25, § 2003(1); Mich. Comp. Laws § 28.425b(7); Minn.Stat. § 624.714(2)(b); Miss.Code Ann. § 45-9-101(6)(c); Mo.Rev.Stat. § 571.101(1); Mont.Code Ann. § 45-8-321(1); Neb.Rev. Stat. § 69-2430(3)(b), 69-2433; Nev.Rev. Stat. § 202.3657(3); N.H.Rev.Stat. Ann. § 159:6(I)(a); N.M. Stat. Ann. § 29-19-4(A); N.C. Gen.Stat. § 14-415.12; N.D. Cent.Code §§ 62.1-04-03(1); Ohio Rev.Code Ann. § 2923.125(D); Okla. Stat. tit. 21, § 1290.12(12); Or.Rev.Stat. § 166.291; 18 Pa. Cons.Stat. Ann. § 6109(e)(1); S.C.Code Ann. § 23-31-215(A)-(C); S.D. Codified Laws § 23-7-7; Tenn.Code Ann. § 39-17-1351; Tex. Gov’t Code Ann. § 411.172; Utah Code Ann. § 53-5-704; Va.Code Ann. § 18.2-308.02; Wash. Rev.Code § 9.41.070; W. Va. Code § 61-7-4; Wis. Stat. § 175.60; Wyo. Stat. Ann. § 6-8-104(b). In addition, Alabama and Connecticut "by statute allow considerable police discretion but, in practice, commonly issue permits to applicants who meet the same standards as in shall-issue states.” Johnson, supra, at 21; see also Ala. Code § 13A-11-75; Conn.Gen.Stat. § 29-28(a).

. See Cal.Penal Code § 26150; Del.pode Ann. tit. 11, § 1441; Haw.Rev.Stat. § 134-9(a); Mass. Gen.Laws :ch. 140, § 131(d); Md.Code Ann., Pub. Safety § 5-306; N.J. Stat. Ann. § 2C:58-4(c); N.Y. Penal Law § 400.00(2)(f); R.I. Gen.Laws § 11-47-11(a).

. E.g., N.J. Stat. Ann. § 2C:58-4(c).

. E.g., N.Y. Penal Law § 400.00(2)(f).

. E.g., Md.Code Ann., Pub. Safety § 5-306(a)(5)(ii).

. Of the remaining two states — Vermont and Illinois — Vermont issues no permits to carry weapons and public carry is allowed, whereas Illinois prohibited public carry altogether.

. During the pendency of this litigation, two of the original plaintiffs were granted permits, and thus their cases became moot.

. For the same reasons, the majority’s assertion that "it may be more accurate” to discuss whether or not the individual right to bear arms for self-defense purposes "exists,” rather than whether it "extends,” outside the home conflicts with Marzzarella. See Maj. Typescript at 430 n. 5.

. In Marzzarella, we interpreted the phrase "presumptively lawful” to mean that "these longstanding limitations are exceptions to the right to bear arms,” although we acknowledged that this was not the only reasonable interpretation. 614F.3dat91.

. Several other exceptions existed for certain occupations, as well as carry in one’s home or business and carry while hunting.

. Prior to Siccardi, only two cases had mentioned the need requirement, and neither had ascribed any meaning to it. See McAndrew v. Mularchuk, 33 N.J. 172, 162 A.2d 820, 827 (1960); State v. Neumann, 103 N.J.Super. 83, 246 A.2d 533, 535 (Monmouth Cnty.Ct.1968).

. Even if modern laws alone could satisfy the longstandingness test, there presumably would have to be a strong showing that such laws are common in the states. Cf. Kennedy v. Louisiana, 554 U.S. 407, 422-26, 128 S.Ct. 2641, 171 L.Ed.2d 525 (2008) (only six states permitting death penalty for rape of a child shows national consensus against it). Today, only eight States have enacted may-issue permitting regimes like New Jersey’s, which condition the issuance of a permit on some show *451 ing of special need. By contrast, forty-one States either require no permit at all or have enacted shall-issue permitting schemes for concealed carry. And over half the States do not require permits for open carry. See Part I, supra.

. I agree with my colleagues that First Amendment prior restraint doctrine does not apply in the Second Amendment context. Although "the First Amendment is a useful tool in interpreting the Second Amendment,” Marzzarella, 614 F.3d at 96 n. 15, we have never endorsed a wholesale importation of First Amendment principles into the Second Amendment. For instance, in Barton we de *453 dined to "recognize an 'overbreadth’ doctrine outside the limited context of the First Amendment.” 633 F.3d at 172 n. 3.

. The majority acknowledges this evidentiary void, see Appellees' Feb. 23, 2013 Letter at 1-2, although my colleagues characterize the State’s failuie too charitably: "To be sure, New Jersey has not presented us with much evidence____” Maj. Typescript at 437 (emphasis added).

. To be clear, New Jersey need not show that the justifiable need requirement is the least restrictive means of combating the dangers of misuse and accidental use. Rather, New Jersey fails to meet its burden under intermediate scrutiny both because there is no reasonable fit between the justifiable need requirement and the State's asserted interest in combating misuse and accidental use of handguns, and because New Jersey’s desire to ration handgun use too broadly burdens conduct protected by the Second Amendment.

. FBI Uniform Crime Reports, Crime in the United States 2011, http://www.fbi.gov/aboutus/cjis/ucr/crime-in-the-u.s/2011/crime-in-theu.s.-2011/tables/expanded-homicide-data-table-8 (last visited July 16, 2013).